UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


ALL AMERICAN CHECK CASHING, INC.,
A MISSISSIPPI CORPORATION, AND
MID-STATE FINANCE, INC.,
A MISSISSIPPI CORPORATION                                    PLAINTIFFS

VS.                              CIVIL ACTION NO. 3:16CV55TSL-RHW

CHARLOTTE CORLEY, IN HER CAPACITY AS
COMMISSIONER OF THE MISSISSIPPI DEPARTMENT
OF BANKING AND CONSUMER FINANCE, AND
TAFT WEBB, AN INDIVIDUAL IN HIS PERSONAL
CAPACITY, KRIS BOOKER, AN INDIVIDUAL IN HIS
PERSONAL CAPACITY, AND KATHERINE CHRISTIAN,
AN INDIVIDUAL IN HER PERSONAL CAPACITY, AND
VARIOUS JOHN DOES AND JANE DOES                             DEFENDANTS


MEMORANDUM OPINION AND ORDER

On January 29, 2016, plaintiff All American Check Cashing
(All American) filed a complaint in this cause seeking money
damages and injunctive relief prohibiting the Mississippi
Department of Banking and Consumer Finance (DBCF or the
Department) from revoking its licenses to do business in the state
and from seizing assets of All American, which it reported had
been threatened and it believed was imminent.  Upon filing its
complaint, All American contemporaneously moved for a temporary
restraining order and preliminary injunction, contending that in
the absence of injunctive relief, it faced imminent closure by the
Department.  At the court's direction, defendant Charlotte Corley,

in her official capacity as Commissioner of the DBCF,[1] filed an expedited response to the motion.  Therein, she argued that the court should abstain from considering plaintiff's request for injunctive relief based on the doctrine of <u>Younger</u> abstention and further contended, in the alternative, that All American had failed to establish any of the requirements for obtaining injunctive relief.  After receiving additional briefing from the parties on the abstention issue, the court scheduled a hearing for February 12, 2016.  At the hearing, which was directed primarily to the issue of <u>Younger</u> abstention, All American asserted arguments for rejecting <u>Younger</u> abstention that had not been previously raised.  Thus, following the hearing, the court requested and/or permitted additional briefing by the parties addressing these matters.  Upon now having considered the parties' submissions and arguments, the court concludes that it must abstain from exercising its jurisdiction over All American's claim for injunctive relief.

---

[1]    The suit against Corley in her official capacity is effectively a suit against the Department itself.  <u>See</u> <u>Monell v. Dept. of Social Serv. of City of N.Y.</u>, 436 U.S. 658, 689 n.55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (stating that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"); <u>see also</u> <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.").

Background

All American is in the business of check cashing, short-term lending, and title loans, and has more than forty locations in the state of Mississippi.  The Mississippi Department of Banking and Consumer Finance is the state agency responsible for licensing and supervision of these types of financial service businesses in the state.  See Miss. Code Ann. § 75-67-503(e) (DBCF Commissioner is state's designated official for purpose of enforcing Check Cashers Act); Miss. Code Ann. § 75-67-505 (establishing licensing requirements for check cashing businesses); Miss. Code Ann. § 75-67-403(c) (Commissioner of DBCF is the designated official for the purpose of enforcing Title Pledge Act); Miss. Code Ann. § 75-67-419 (establishing licensing requirements for title pledge lenders).  The Department is authorized by statute to conduct examinations of businesses under its jurisdiction to ensure they are operating in compliance with applicable laws.  See Miss. Code Ann. § 75-67-523[2] and Miss. Code Ann. § 75-67-515(2)[3] (Check

---

[2]    This statute states:
The commissioner, or his duly authorized representative, for the purpose of discovering violations of this article and for the purpose of determining whether persons are subject to the provisions of this article, may examine persons licensed under this article and persons reasonably suspected by the commissioner of conducting business which requires a license under this article, including all relevant books, records and papers employed by those persons in the transaction of their business, and may summon witnesses and examine them under oath concerning matters relating to the

3

Cashers Act); Miss. Code Ann. § 75-67-435[4] and Miss Code Ann. §

75-67-447[5] (Title Pledge Act).  Pursuant to this authority, agents

of the Department appeared at six All American locations and its

administrative office in Madison, Mississippi, on the morning of

June 16, 2014, to gather information as part of an examination/

investigation.  Thereafter, on June 19, 2014, the Department

business of those persons, or such other matters as may
be relevant to the discovery of violations of this
article, including without limiting the conduct of
business without a license as required under this
article.
Miss. Code. Ann. § 75-67-523.

    [3]   This statute provides that "[t]o assure compliance with
the provisions of this article, the department may examine the
books and records of any licensee without notice during normal
business hours."  Miss. Code. Ann. § 75-67-515(2).

    [4]   This statute recites that "[t]o assure compliance with
the provisions of this article, the department may examine the
books and records of any licensee without notice during normal
business hours."  Miss. Code. Ann. § 75-67-435(3).

    [5]   This provision states:
The commissioner, or his duly authorized representative,
for the purpose of discovering violations of this
article and for the purpose of determining whether
persons are subject to the provisions of this article,
may examine persons licensed under this article and
persons reasonably suspected by the commissioner of
conducting business that requires a license under this
article, including all relevant books, records and
papers employed by those persons in the transaction of
their business, and may summon witnesses and examine
them under oath concerning matters relating to the
business of those persons, or such other matters as may
be relevant to the discovery of violations of this
article, including without limitation the conduct of
business without a license as required under this
article.
Miss. Code. Ann. § 75-67-447.

issued to All American a cease and desist letter instructing it to cease a program through which All American was alleged to have illegally extended short-term loans by accepting only a fee from the customer, in violation of Miss. Code Ann. § 75-67-519(4) & (5). All American contends it complied with this directive, and that upon a follow-up examination in December 2014, examiners noted the "apparent policy changes" and that no instances of fee-only transactions were found.

Thereafter, on May 12, 2015, the Department issued to All American a 30-page Report of Examination (Report) based on its 2014 investigation in which it reported, among other things, that based on debit card records, it had identified 1,515 illegal fee-only transactions, that would support a penalty of $757,700 ($500 per transaction), see Miss. Code Ann. § 75-67-527(4) (providing that Commissioner may impose a civil penalty, not to exceed $500 per violation, "against any licensee adjudged by the commissioner to be in violation of the provisions of this article"); based on statements from customers, it had identified another 1,789 transactions that it considered were illegal fee-only transactions,[6] which would support a penalty of $894,500 ($500 per

_____

[6]   While All American alleges that agents appeared at six locations on June 14, the Report of Examination reflects that an examination of 14 locations and All American's home office had commenced in February 2014 and continued through the date of the Report.

5

transaction) together with an additional $894,500 for the attendant falsification of records to prevent discovery of the transactions, <u>see</u> Miss. Code Ann. § 75-67-425, -527; and that All American employees at a number of locations had refused the Department's examiners access to at least 7,401 business records, with each refusal constituting a violation of Miss. Code Ann. §§ 75-67-515, -523, -415(b), -447 and -435, supporting a penalty of $740,100.  The Report recommended possible remedies, including assessment of penalties, as noted, and refunds to customers of fees wrongly charged, as well as the removal and replacement of management by persons involved with the violations and intentional bad acts described (including All American CEO Michael Gray).

The Report, signed by examiner Mike Garrard and Director of the Department's Consumer Finance Division Taft Webb, directed that All American respond to the Report in writing within 45 days to address the matters contained in the Report, and recited that the Department was not "unwilling to further discuss resolution or consider alternative suggested remedies."  It warned, however, that if the parties were unable to agree on specific terms and conditions under which the Licensee might continue to operate, "the Department may recommend that all licenses now held by Licensee be revoked following consideration of Licensee's response and the subsequent issuance 'Commissioner's Findings and Order' [sic] in this matter."

All American states that it responded to the Report and
undertook to work in good faith with the Department on settlement
terms.  However, on January 12, 2016, counsel for the Department
wrote to All American, stating that it had not received a response
to the Department's settlement offer in nearly a month, and
advising that

> if we cannot reach an arrangement, at least in
> principle, on or before February 1, 2016, DBCF will move
> forward with our administrative process.  As you are
> aware from various conversations, the recommendation to
> the Commissioner will likely include, *inter alia*,
> revocation of all licenses granted to any licensee owned
> by Mr. Michael Gray.

<u>All American's Complaint and Motion</u>

All American did not respond to the letter.  Instead, on
Friday, January 29, 2016, one business day before the deadline set
forth in the Department's letter, All American filed a Verified
Complaint for Damages and Injunctive Relief asserting claims
against Corley, in her official capacity as Commissioner of the
Department, and against John and Jane Doe defendants (identified
as agents of the Department), alleging that the Department and its
agents have "engaged in an intentional and/or negligent campaign
of irrational, unreasonable, unnecessary, and illegal actions
intended to deprive All American of its Constitutionally-protected
rights."  All American pled claims under 42 U.S.C. § 1983 for
alleged violation of its rights under the First, Fourth, Fifth and
Fourteenth Amendments of the U.S. Constitution and for violation

of its rights under Article III of the Mississippi Constitution, and sought damages and injunctive relief.[7]  It contemporaneously filed a Motion for Temporary Restraining Order and Preliminary Injunction, asking that the court enter an order "prohibiting the Defendant from revoking All American's licenses to operate,

---

[7]     Counts one through fourteen of the complaint sought damages for various alleged violations of All American's rights under the U.S. and Mississippi Constitutions, as follows:  Count One alleged a federal due process claim based on the Department's refusal to renew the licenses of All American locations that were not subject to investigation and instead granting them only temporary licenses.  Count Two alleged a federal due process claim based on the Department's refusal to renew the licenses of *all* All American locations, including those that were the subject of the Department's investigation.  Counts Three through Six, respectively, complained that the Department's "heavy-handed" actions in the course of its examination/investigation violated All American's First Amendment right to free speech and Fifth and Fourteenth Amendment right to be free from self-incrimination by intimidating and coercing All American employees to make incriminating statements about All American's activities through the use of threats and coercion; its Fourth Amendment right to freedom from unreasonable search and seizure by entry into areas of All American locations that exceeded the proper scope of its investigation and by seizing and failing to return materials to which it was not entitled and by seizure and false imprisonment of certain All American employees.  Count Seven charged a violation of All American's Fourteenth Amendment right to Equal Protection based on allegations that because of DBCF's "antipathy for the check cashing industry," it has treated and continues to treat All American differently than other legal industries in Mississippi.

Counts Eight through Fourteen alleged that the same conduct identified in Counts Three through Seven as violating All American's rights under the U.S. Constitution also violated All American's corresponding rights under the Mississippi Constitution.

Finally, Count Fifteen requested injunctive relief, and specifically, asked that the court enjoin the Department "from revoking All American licenses and/or seizing All American assets until a full trial on the merits is heard."

seizing All American's assets, or taking any other steps intended to bring closure to All American."

All American reports that within an hour of filing its complaint and motion, it received from the Department, under the signature of Taft Webb, a Notice of Recommended Findings, Penalty and Revocation of Licenses (Notice).  In that Notice, the Department referenced "the numerous violations of both the Mississippi Check Cashers Act and the Mississippi Title Pledge Act" identified in the May 2015 Report and set out examples of such violations.  The Notice further recited that the Department had "discovered other unauthorized activities subsequent to the issuance of the Report, including an unauthorized loan of $950,000 to an entity in which Michael Gray has an ownership interest." The Notice stated that the Department would recommend that the Commissioner levy a total penalty of $3,000,000 against All American pursuant to Miss. Code Ann. §§ 75-67-527(4)(Check Cashers Act provision authorizing civil penalties), and 75-67-431(5) (authorizing penalty under Title Pledge Act), and further, that in light of the "acts or grossly negligent omissions by Mr. Gray that have directly caused the violations detailed in the Report," would also recommend that all licenses held by any entity owned by Mr. Gray should be permanently revoked, as purportedly authorized by Miss. Code Ann. §§ 75-67-521(1) (Check Cashers Act) and 75-67-423(1) (Title Pledge Act).  Finally, the Notice advised that in

9

the event All American agreed to these recommendations, it could sign the attached waiver form and remit its payment of $3,000,000 to the Department within 10 days; or, if it did not agree with these recommendations, then,

> pursuant to statute you may request a hearing before the Commissioner on this matter.  If you should desire a hearing, you must request a formal hearing, in writing, within ten (10) business days of receipt of this letter. Until a Final Order is issued by the Commissioner, none of these recommendations shall have any effect upon the Licensees.

After receiving this Notice, All American first filed a supplemental memorandum in support of its motion for injunctive relief, claiming that despite the statutory (and general due process) requirement that any license revocation be preceded by notice and a hearing, <u>see</u> Miss. Code Ann. § 75-67-521(1) (Check Cashers Act provision stating that commissioner may suspend or revoke license "after notice and hearing"), and § 75-67-423 (Title Pledge Act provision authorizing Commissioner to suspend or revoke any license "after notice and hearing"), there is no published rule or regulation that would support the Department's demand that All American request a formal hearing, in writing, within 10 days or face a $3,000,000 fine and revocation of its licenses.  In fact, it argued, the Department has no published rules or regulations establishing hearing procedures, and that as a result, the Department's demand of All American is in violation of All American's due process rights.  All American then filed an amended

10

complaint, asserting an additional due process claim based on allegations that the Department's failure to promulgate and publish any rules or procedures for a hearing violates Mississippi statutory law, which requires that this be done; and that the Department's actions intended toward revoking All American's licenses without proper rules and regulations is a *per se* violation of All American's due process rights.[8]

### Younger Abstention

All American has moved for entry of a temporary restraining order/preliminary injunction prohibiting the Defendant from revoking All American's licenses to operate, seizing All American's assets, or taking any other steps that are intended to, or likely to, result in the closure of All American, including imposition of a substantial fine, as has been recommended to the Commissioner by Director Webb. All American maintains it has met all the criteria for such injunctive relief and that its motion is

---

[8]    The amended complaint, in addition to adding this due process claim, also added another plaintiff, Mid-State Finance, Inc., another check cashing, short-term lending and title loan business owned by Michael Gray, which has a single location in Mississippi.   References herein to All American are deemed to include Mid-State Finance.

The amended complaint also added three individual defendants, Taft Webb, Katherine Christian and Kris Booker, employees of the Department that were allegedly involved in the examination/investigation of All American.

thus due to be granted.[9]  The Department denies that All American
can demonstrate that it is entitled to injunctive relief but
contends whether it can or not is beside the point since the
doctrine of <u>Younger</u> abstention requires that the court abstain
from considering the merits of plaintiff's request for injunctive
relief.

As a general rule, where a district court has jurisdiction
over a case, the court has a "virtually unflagging obligation" to
hear and decide the case, <u>Colorado River Water Conservation Dist.</u>
<u>v. United States</u>, 424 U.S. 800, 813, 817, 96 S. Ct. 1236, 47 L.
Ed. 2d 483 (1976); thus, generally, "the pendency of an action in
[a] state court is no bar to proceedings concerning the same
matter in the Federal court having jurisdiction," <u>id.</u>, 96 S. Ct.
1236.  There are exceptions, however, one of which is the
abstention doctrine established in <u>Younger v. Harris</u>, 401 U.S. 37,
91 S. Ct. 746, 27 L. Ed. 2d 669 (1971), which requires that in the
absence of special circumstances suggesting bad faith, harassment,
or irreparable injury that is both serious and immediate, the

---

[9]     These criteria are well established:  To be entitled to
a temporary restraining order/preliminary injunction, an applicant
must show (1) a substantial likelihood that it will prevail on the
merits, (2) a substantial threat that it will suffer irreparable
injury if the injunction is not granted, (3) its substantial
injury outweighs the threatened harm to the party whom it seeks to
enjoin, and (4) granting the preliminary injunction will not
disserve the public interest.  <u>Bluefield Water Ass'n, Inc. v. City</u>
<u>of Starkville, Miss.</u>, 577 F.3d 250, 252-53 (5th Cir. 2009)
(internal citation omitted).

federal courts must abstain from hearing claims for injunctive or declaratory relief "[when] assumption of jurisdiction ... would interfere with pending state proceedings, whether of a criminal, civil, or even administrative character." La. Debating and Literary Ass'n v. City of New Orleans, 42 F.3d 1483, 1489 (5th Cir. 1995) (internal quotation marks and citation omitted).  See also Gibson v. Berryhill, 411 U.S. 564, 573-74, 93 S. Ct. 1689, 36 L. Ed. 2d 488 (1973) (recognizing that under Younger, "a federal court may not enjoin a pending state criminal proceeding in the absence of special circumstances suggesting bad faith, harassment or irreparable injury that is both serious and immediate.").  The Younger abstention doctrine is based on notions of comity and federalism, and prohibits federal judicial interference with pending state judicial proceedings where important state interests are involved and the plaintiff has or will have an opportunity to present his federal claims in the state proceedings.  Louisiana Debating and Literary Ass'n, 42 F.3d at 1489.

Recently, in Sprint Communications, Inc. v. Jacobs, the Supreme Court again stressed that "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States[,]" – U.S. –, 134 S. Ct. 584, 586, 187 L. Ed. 2d 505 (2013), and it held that the Younger abstention doctrine applies to only three categories of claims:  "state criminal prosecutions," "civil enforcement proceedings," and "civil

proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions," id. at 586-87.  The state administrative proceeding at issue here clearly falls within the "civil enforcement proceedings" category.  The Court described the kind of civil enforcement proceeding to which Younger applies as generally concerning state proceedings "akin to a criminal prosecution" in "important respects": They are "characteristically initiated to sanction the federal plaintiff, i.e., the party challenging the state action, for some wrongful act"; "a state actor is routinely a party to the state proceeding and often initiates the action"; and "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges."  Id. at 592.  That precisely describes the state proceedings involved in this case.

In general, where a case presents circumstances that fall into one of the three categories described in Sprint, the Younger doctrine requires that federal courts decline to exercise jurisdiction over claims for equitable relief when three conditions are met: (1) the federal proceeding would interfere with an "ongoing state judicial proceeding"; (2) the state has an important interest in regulating the subject matter of the claim; and (3) the plaintiff has "an adequate opportunity in the state proceedings to raise constitutional challenges."  Bice v. Louisiana Pub. Def. Bd., 677 F.3d 712, 716 (5th Cir. 2012)

(quoting _Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n_, 457 U.S. 423, 432, 102 S. Ct. 2515, 73 L. Ed. 2d 116 (1982)).  If these requirements are met, a federal court may refuse to abstain and grant the requested equitable relief only if

> (1) the state court proceeding was brought in bad faith or with the purpose of harassing the federal plaintiff, (2) the state statute is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it," or (3) application of the doctrine was waived.

_Texas Ass'n of Business v. Earle_, 388 F.3d 515, 519 (5th Cir. 2004) (_quoting_, among other authorities, _Younger_, 401 U.S. at 53-54, 91 S. Ct. 746).

Here, the Department maintains that the requirements for _Younger_ abstention are met and that no exceptions apply.  All American, on the other hand, insists that only one of the three requisites for _Younger_ abstention applies: the State, it concedes, has an important interest in consumer protection.  However, it denies the other requirements are satisfied and asserts, further,

that at least two, if not more, exceptions to <u>Younger</u> apply.[10]

Ongoing State Proceeding

All American contends there is no "ongoing" state proceeding since at the time it filed this action (and indeed, to date), no formal charges have been brought against it; instead, it has merely been advised that formal charges will be brought.[11] Contrary to All American's position, there is no doubt that state administrative proceedings have commenced and are ongoing.  In <u>Rickhoff v. Willing</u>, the investigative staff of the Texas State Commission on Judicial Performance commenced an investigation into a complaint that a certain letter sent by Rickhoff, a probate court judge, in connection with his reelection campaign violated

---

[10]     In its initial response to the Department's assertion of <u>Younger</u> abstention as a basis for denial of All American's motion for injunctive relief, All American argued that <u>Younger</u> has no potential applicability to this case since <u>Younger</u> applies only in cases where the plaintiff is seeking to enjoin enforcement of a state statute that is unconstitutional on its face and All American is not challenging the constitutionality of any state statute but is instead challenging the constitutionality of defendants' actions.  It appears that All American has abandoned this position.  If not, the court would simply point out that while a challenge to the constitutionality of a state statute will require <u>Younger</u> abstention in appropriate circumstances, <u>Younger</u> abstention is not limited to claims involving such challenges. <u>See</u>, <u>e.g.</u>, <u>Rickhoff v. Willing</u>, 457 Fed. Appx. 355, 357–59 (5th Cir. 2012) (applying <u>Younger</u> to a plaintiff's claim that the Texas Judicial Conduct Commission's investigation violated his constitutional rights); <u>Milone v. Flowers</u>, 758 F. Supp. 2d 362, 363–64 (S.D. Miss. 2010) (abstaining under <u>Younger</u> from hearing claims that the defendants' acts and official policies violated the federal plaintiffs' constitutional rights).

[11]     For <u>Younger</u> to apply, the state proceeding must be judicial in nature.

the Texas Code of Judicial Conduct.  457 F. App'x 355, 357 (5th
Cir. 2012).  As part of the investigation, the Commission notified
Rickhoff of the ongoing investigation and requested that he
respond to a questionnaire regarding the letter.  Id.  He did not
respond to the request but instead filed suit against the
Commission seeking to enjoin the Commission's investigation.  Id.
While the federal suit was pending, Richhoff responded to the
questionnaire and the Commission, following a hearing, found that
Rickhoff's letter did not violate the canon; however, it offered
him a tentative sanction regarding other allegations of
wrongdoing.  In holding that proceedings were ongoing, the Fifth
Circuit explained:

> The relevant inquiry in determining that the state
> judicial proceeding was "ongoing" for purposes of
> Younger abstention is whether the state proceeding was
> pending at the time the federal action was instituted.
> See Pennzoil v. Texaco, 481 U.S. 1, 17, 107 S. Ct. 1519,
> 95 L. Ed. 2d 1 (1987).  It is clear from the record that
> the Commission was still investigating the alleged Canon
> violation at the time Rickhoff filed his federal claims
> against the Commission.  Notably, the Commission's
> proceedings were still pending at the time the district
> court determined the Younger abstention because Rickhoff
> had yet to accept the tentative sanction proposed by the
> Commission.  Thus, the state judicial proceedings were
> "ongoing," thereby satisfying the first prong of
> Younger.

Rickhoff, 457 F. App'x at 359.  Here, prior to the time this
federal suit was filed, the Department had commenced and concluded
its investigation; issued its Report of Examination which detailed
possible penalties; requested and received a response to the

17

report; entered negotiations with All American over a settlement, and informed All American of the penalties that would likely be recommended if an agreement could not be reached.  Administrative proceedings were (and are) clearly "ongoing."

Adequate Opportunity

To satisfy the third Younger requirement, the court must be able to find that All American will have an adequate opportunity in the state proceeding to raise its constitutional challenges. Rickhoff, 457 F. App'x at 359 (citing Wightman v. Texas Supreme Court, 84 F.3d 188, 189 (5th Cir. 1996)).  See also DeSpain v. Johnston, 731 F.2d 1171, 1178 (5th Cir. 1984) (stating that "[t]he operation of the Younger doctrine is dependent upon the ability of the state courts to provide an adequate remedy for the violation of federal rights.").  The Department asserts that All American can certainly raise its constitutional challenges and other arguments for consideration at the Department hearing, as well as on an appeal to the chancery court (and to the state supreme court, if necessary).  See Wightman, 84 F.3d at 190 (finding that federal plaintiff would be able to raise his constitutional and procedural claims in the state investigatory hearing and in subsequent appeals where no state agency rules or statutes either prevented him from presenting or a panel or court from considering his constitutional claims); Electronic Data Systems Corp. v. Miss. Div. of Medicaid, 853 So. 2d 1192, 1211 (Miss. 2003) (holding that

18

"when there is not a statutory plan for appeal from a state board or agency's decision and the aggrieved party does not have an adequate remedy at law, jurisdiction to review of [sic] the board or agency's decision lies with the chancery court") (internal quotation marks and citation omitted); Tillmon v. Mississippi State Dep't of Health, 749 So. 2d 1017, 1020-21 (Miss. 1999) (explaining that issues proper for consideration on appeal from administrative agency include whether there was a violation of some statutory or constitutional right of the complaining party).

All American argues in response that it cannot possibly know whether it will have an adequate opportunity to raise its constitutional challenges in the state proceedings since the Department has failed to promulgate any rules or regulations for the conduct of its hearings.  In this regard, it points out that the provisions of the Mississippi Check Cashers Act and Title Pledge Act requiring that any license revocation be preceded by notice and a hearing state that the manner of giving notice and conducting such "shall be performed in accordance with procedures prescribed by the commissioner in rules or regulations adopted under Mississippi Administrative Procedures Law, Section 25-43-1 et seq.", see Miss. Code. Ann. § 75-67-521(3); Miss. Code Ann. § 75-67-423(3).  All American further asserts that under the terms of the Mississippi Administrative Procedures Law (MAPL) and regulations adopted by the Secretary of State pursuant to the

19

MAPL, all state agencies were required to submit their proposed

notice and hearing procedures to the Secretary of State in or

after July 2005 for approval and publication, yet the Department

failed to do this and thereby has failed to establish any hearing

procedures.[12]  All American's position is belied by Miss. Code Ann.

§ 25-43-1.101(2) of the MAPL, which states:

> Nothing in this chapter shall be construed as
> invalidating any rule or regulation adopted before July
> 1, 2005, if such rule or regulation was properly adopted
> in accordance with the law as it existed at the time of
> adoption.

See also Leslie Southwick, 1 MS Prac. Encyclopedia MS Law § 2:22

(2015 ed.) (Under MAPL, "[n]o rule or regulation adopted before

July 1, 2005, is invalidated as a result of the APL

requirements").  The record reflects that in 1996, the Department

adopted notice and hearing rules as the

---

[12]   The MAPL charges the Secretary of State with the duty to publish an administrative bulletin and then an administrative code containing all the rules and regulations adopted by all state agencies.  See Miss. Code Ann. § 23-45-2.101(5)(a) (providing that every state agency shall "[a]dopt rules of practice setting forth the nature and requirements of all formal and informal proceedings"); Miss. Code Ann. § 25-43-3-112 (providing that every agency "shall file in the Office of the Secretary of State each rule it adopts...."); Miss. Code Ann. § § 25-43-2.101(5)(a) (requiring that Secretary of State "cause an administrative code to be compiled, indexed by subject and published in a format prescribed by the Secretary of State by rule.  All of the effective rules of each agency must be published and indexed in that publication."); Miss. Admin. Proc. Act Rule 3.2 (requiring that "each agency submit a complete and current compilation of its rules and regulations to the Secretary of State no later than June 30, 2011).

> procedures to be observed at any hearings provided for
> under the Mississippi Pawnshop Act . . ., the
> Mississippi Savings Bank Law . . ., the Mississippi
> International Banking Act . . ., and for any hearings
> provided for in connection with any other acts,
> businesses, professions, or licenses that may be
> regulated by the Department of Banking and Consumer
> Finance for which hearing procedures have not been
> previously adopted.

Those procedures were approved by the Secretary of State effective

January 3, 1997 and are published on the Department's website.

All American has acknowledged that procedures for notice and

hearing may be found on the Department's own website and also that

the Department has provided it with a copy of those procedures.

It insists, though, that these purported procedures are not valid

since the Department did not resubmit these procedures to the

Secretary of State after 2005 for publication by the Secretary of

State.  According to All American, since the Department has not

complied with the requirements of the MAPL regarding submission of

notice and hearing procedures to the Secretary of State, then the

Department cannot be considered to have in place any procedures

for notice and hearing, as required by Miss. Code Ann. §§ 75-67-

521(3), 75-67-423(3).  However, as the Department's notice and

hearing rules were adopted prior to 2005 in accordance with the

law as it existed at the time of adoption, then pursuant to §

25-43-1.101(2), even if the Department has failed to comply with a

rule promulgated by the Secretary of State regarding resubmission

of its existing rules for the purpose of publication on the

Secretary of State's website, that failure does not operate to invalidate the Department's rules.[13]

### Younger Exceptions

The policy of restraint that animates the Younger doctrine "is founded on the 'basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.'" Kugler v. Helfant, 421 U.S. 117, 123, 95 S. Ct. 1524, 44 L. Ed. 2d 15 (1975) (quoting Younger, 401 U.S. at 43, 91 S. Ct. 746). Thus, the Court in Younger held that "in

---

[13] In 2012, the Department submitted to the Secretary of State a set of Check Cashing regulations which it represented were intended to supersede the Department's existing regulations. All American points out that those regulations did not include any procedures for notice and hearing. However, as the Department explained during the February 12 hearing, the regulations submitted to the Secretary of State were Check Cashing regulations only; those regulations did not include any hearing procedures because the Department does not have separate hearing procedures applicable to hearings under the Check Cashers Act. Rather, the hearing procedures adopted in 1996 apply to all hearings before the Department and are not limited to hearings under the Check Cashers Act.

All American further argues that the Department's notice and hearing procedures were "apparently repealed in 2006" by virtue of Rule 1.1 of the Secretary of State's MAPL rules, which states, "Upon their effective date, these rules and regulations supersede and repeal all previous rules and regulations promulgated under the APA and adopted as Title 01-Administrative Law and Secretary of State." However, the rules that this was repealing were not any agency's rules but rather the Secretary of State's own MAPL rules. The Secretary of State did not purport to repeal the Department's rules, nor could it have done so since the MAPL specifically preserved the validity of pre-2005 agency rules.

the absence of exceptional circumstances creating a threat of irreparable injury 'both great and immediate,' a federal court must not intervene by way of either injunction or declaratory judgment in a pending state criminal prosecution" or civil enforcement action.  See Kugler, 421 U.S. at 123, 95 S. Ct. 1524 (citing Younger).  As this statement indicates, even where the three prerequisites for Younger abstention are satisfied, there are circumstances, albeit few and narrow, in which the federal court may assert jurisdiction.  See Bice, 677 F.3d at 716 (if prerequisites for Younger abstention are satisfied, "then a federal court can assert jurisdiction only if certain narrowly delimited exceptions to the abstention doctrine apply.") (internal quotation marks and citation omitted).  In this regard, "[a] federal court should not abstain when the state court proceeding is brought in bad faith or with the purpose of harassing the federal plaintiff."  DeSpain v. Johnston, 731 F.2d 1171, 1180 (5th Cir. 1984) (citing Younger, 401 U.S. at 49, 91 S. Ct. 746).  "Extraordinary circumstances also justify intervention," id. (citing Younger, 401 U.S. at 53-54, 91 S. Ct. 746), where irreparable injury is shown.  See Chester v. Thaler, 522 F. App'x 208, 209 (5th Cir. 2013) (holding that "[a] federal court may provide equitable intervention in a state criminal proceeding even in the absence of the usual prerequisites of bad faith and harassment when extraordinary circumstances in which the necessary

23

irreparable injury can be shown are present."); *cf*. Septum, Inc.
v. Keller, 614 F.2d 456, 463 (5th Cir. 1980) (*Younger* holds that
to enjoin a pending state proceeding, "not only must the remedy at
law be inadequate, but there must be a 'showing of bad faith,
harassment, or any other unusual circumstances that would call for
equitable relief[,]' which means, essentially, that "the plaintiff
also must show severe, irreparable harm in order to get a state
proceeding enjoined.") (quoting *Younger*, 401 U.S. at 54, 91 S. Ct.
746).  The Supreme Court has not defined the scope of the
"extraordinary circumstances" exception.  Kugler, 421 U.S. at 124,
95 S. Ct. 1524 (stating that "[t]he very nature of 'extraordinary
circumstances' ... makes it impossible to anticipate and define
every situation that might create a sufficient threat of such
great, immediate, and irreparable injury as to warrant
intervention in state criminal proceedings").  It has made clear,
though, that "[o]nly if 'extraordinary circumstances' render the
state court incapable of fairly and fully adjudicating the federal
issues before it, can there be any relaxation of the deference to
be accorded to the state ... process."  Id., 95 S. Ct. 1524.
These extraordinary circumstances include "a finding that a state
statute is 'flagrantly and patently violative of express
constitutional prohibitions in every clause, sentence and
paragraph, and in whatever manner and against whomever an effort
might be made to apply it'".  Id., 95 S. Ct. 1523 (citing *Younger*,

401 U.S. at 53-54, 91 S. Ct. 107).  Moreover, the existence of a biased state tribunal is another one of the "extraordinary circumstances alluded to in Younger where abstention is inappropriate even though all of the Younger elements have ostensibly been met."  Id. at 124-25, 95 S. Ct. 1524.  See also Esso Standard Oil Co. v. Lopez-Freytes, 522 F.3d 136, 143 (Esso II) (1st Cir. 2008) (extraordinary circumstances allowing an exception to the abstention doctrine include "extreme bias completely render[ing] a state adjudicator incompetent and inflict[ing] irreparable harm upon the petitioner.") (citing Gibson, 411 U.S. 564, 93 S. Ct. 1689); Rodriquez v. Vila, 565 F. Supp. 2d 328, 339 (D.P.R. 2008) (stating that "[a]mong those extraordinary circumstances are cases in which extreme bias completely renders a state adjudicator incompetent and inflicts irreparable harm upon the petitioner."); Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 201 (2d Cir. 2002) (observing that the Supreme Court has found extraordinary circumstances present on only two occasions: (1) "when a state statute is flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it"; and (2) "when the state administrative agency was incompetent by reason of bias to adjudicate the issues pending before it.") (citations and internal quotations omitted).

In this case, All American argues that the court should not abstain under Younger since the exceptions for bad faith or harassment and a biased tribunal apply.  In the court's opinion, All American has failed to demonstrate a basis for either exception.

### Bad Faith Exception

The Fifth Circuit has held that "[t]he bad faith exception is narrow and is to be granted parsimoniously." Wightman, 84 F.3d at 190 (citing Hefner v. Alexander, 779 F.2d 277 (5th Cir. 1985)). See also McNatt v. Texas, 37 F.3d 629 (5th Cir. 1994) (holding that "[t]he bad faith exception to Younger is extremely narrow and applies only in cases of proven harassment or prosecutions undertaken without hope of obtaining valid convictions."). All American has the heavy burden to prove the exception applies.  See Hensler v. Dist. Four Grievance Comm., 790 F.2d 390, 391-92 (5th Cir. 1986) (holding that court should not enjoin state court proceeding without "allegations and proof of bad faith.").

The Fifth Circuit has applied the bad faith exception in "two major circumstances":

> first, when a state commences a prosecution or
> proceeding to retaliate for or to deter constitutionally
> protected conduct, e.g., Smith v. Hightower, 693 F.2d
> 359 (5th Cir. 1982); Wilson v. Thompson, 593 F.2d 1375
> (5th Cir. 1979); and second, when the prosecution or
> proceeding is taken in bad faith or for the purpose to
> harass.  E.g., Fitzgerald v. Peek, 636 F.2d 943 (5th
> Cir. 1981) (per curiam); Shaw v. Garrison, 467 U.S. 113,
> 119-21 (5th Cir.) cert. denied, 409 U.S. 1024, 93 S. Ct.

26

467, 34 L. Ed. 2d 317 (1972).  In either case, irreparable injury under Younger is established by a sufficient showing of retaliatory or bad faith prosecution, and a federal injunction may issue.  See Wilson, 593 F.2d at 1382-83 (retaliatory prosecution); Shaw, 467 F.2d at 120 (bad faith prosecution); cf. Smith, 693 F.2d at 366-67 (retaliation must be a "major motivating factor and [have] played a prominent role in the decision to prosecute").

DeSpain, 731 F.2d at 1180.  See also Fitzgerald, 636 F.2d at 945 (holding that a state criminal proceeding may be enjoined "if the plaintiff establishes that the conduct allegedly retaliated against or sought to be deterred is constitutionally protected and that the state's bringing of the criminal prosecution is motivated at least in part by a purpose to retaliate against or deter that conduct").

All American has failed to demonstrate that this is a case for application of the narrow bad faith exception.  While All American has identified several circumstances which it contends reflect a bad faith motive on the part of the Department to harass and/or retaliate against All American, it has not argued, much less undertaken to prove, that the Department instituted and conducted its investigation to retaliate for or *to deter constitutionally protected conduct by All American*.  Its position, instead, seems to be that the Department has commenced and is conducting the proceedings in bad faith or for the purpose to harass.  However, it has not established the necessary bad faith and harassment needed to overcome abstention.

27

In support of its position, All American asserts, first, that "heavy-handed tactics" and abuse of police powers by the Department's employees during the June 2014 on-site examination/investigation constituted harassment and was clearly in bad faith.  It claims to believe that the agents' tactics, and the "draconian measures" the Department wishes to impose on All American, "are the result of a vendetta against All American, orchestrated by one or more" unidentified employees of the Department.  Second, it complains that the January 2016 notice(s) from the Department of All American's alleged violations do not include sufficient detail for All American to meet the allegations.  Third, it claims that the fact that the Department sent its January 29 Notice of Recommended Findings, Penalty and Revocation of Licenses less than an hour after All American filed its complaint and motion for injunctive relief in this case is clear evidence of retaliation.  Fourth, All American vaguely refers to "some instances of information getting out to the press" despite a "gentlemen's agreement" with Director Taft Webb that the parties would not speak with the press.  In the court's opinion, these circumstances, whether considered individually or collectively, do not constitute bad faith for purposes of the Younger exception.

Even assuming that one or more employees of the Department spoke with the press about this case and the allegations of

wrongdoing by All American in violation of some "gentlemen's agreement – and there is no proof that this even occurred – such conduct plainly would not tend to show that the proceedings against All American have been brought or are being conducted in bad faith or for the purpose of harassing All American.[14] Likewise, the fact that the Department sent to All American its Notice of Recommended Findings, Penalty and Revocation of Licenses a mere 58 minutes after All American filed its complaint/motion in this cause is hardly proof of bad faith.  All American insists that the notice was clearly retaliatory.  However, in its letter of January 12, counsel for the Department warned that if the parties were unable to reach an agreement on or before February 1, 2016, "DBCF will move forward with our administrative process," and that "the recommendation to the Commissioner will likely include, *inter alia*, revocation of all licenses granted to any licensee owned by Mr. Michael Gray."  Presumably, All American's filing of its complaint and motion signaled to the Department that All American was making no effort to reach an agreement; and the Department, in the face of such knowledge, merely responded as it

---

[14]     All American does not contend that any incorrect or defamatory information was shared with the press.  It merely states that "things popped up in the Mississippi Business Journal" shortly after the parties agreed neither would talk to the press about "what's going on here."  The facts about this litigation reported in the Mississippi Business Journal are matters of public record.

said it would, by moving forward with the administrative process. This is suggestive of neither a retaliatory nor bad faith motive.

The court also finds no merit in All American's objection that the lack of detail in the Department's January 2016 notice(s) is evidence of bad faith. These notices followed the earlier May 2015 Report of Examination, which described in some detail the nature of the violations which the Department claimed to have discovered during its examination/investigation. Even if All American may require additional information in order to fully respond to the charges, e.g., the names of witnesses and customers' names and specific account/transaction information, the lack of this level of detail in the notice(s) of violations does not suggest bad faith.

The court further rejects All American's contention that bad faith and a purpose to harass, is evidenced by the alleged heavy-handed tactics by certain unidentified Department employees during the onsite investigation of six All American locations over a four-day period in June 2014, and the "draconian" remedies sought by the Department, which All American purports to believe are the result of a vendetta by one or more of the John Doe or Jane Doe defendants.

> A state proceeding that is legitimate in its purposes, but unconstitutional in its execution - even when the violations of constitutional rights are egregious – will not warrant the application of the bad faith exception. To invoke this exception, the federal plaintiff must

> show that the state proceeding was initiated with and is
> animated by a retaliatory, harassing, or other
> illegitimate motive.

Diamond "D" Const. Corp., 282 F.3d at 199 (citing Schlagler v.

Phillips, 166 F.3d 439, 441 (2d Cir. 1999)).  All American offers

only speculation, but no proof, that the Department's purpose in

conducting its examination/investigation was other than

legitimate.  Accordingly, it has failed to demonstrate the kind of

bad faith required for application of the bad faith exception to

Younger abstention.

###### Bias Exception

All American contends that because any penalty imposed

against and collected from it in the state administrative

proceeding would directly benefit the Department, it follows that

Commissioner Corley cannot function as the impartial adjudicator

that due process demands; consequently, this court may not abstain

but must instead intervene to protect All American's due process

rights.  For the reasons that follow, the court concludes that All

American has failed to demonstrate that Commissioner Corley

suffers from any potential bias that would preclude her from

adjudicating the charges involving All American in the ongoing

state administrative proceedings.

"Without a showing to the contrary, state administrators 'are

assumed to be men [and women] of conscience and intellectual

discipline.'"  Withrow, 421 U.S. at 55, 95 S. Ct. 1456. (quoting

United States v. Morgan, 313 U.S. 409, 421, 61 S. Ct. 999, 85 L. Ed. 1429 (1941)).  "[T]o overcome this presumption, a litigant must make a 'showing of conflict of interest or some other specific reason for disqualification'."  Yamaha Motor Corp., U.S.A. v. Riney, 21 F.3d 793, 798 (8th Cir. 1994) (quoting Schweiker v. McClure, 456 U.S. 188, 195, 102 S. Ct. 1665, 1670, 72 L. Ed. 2d 1 (1982)).  Bias is a reason for disqualification.  As this court explained at length in Geotes v. Mississippi Board of Veterinary Medicine,

> It is a fundamental precept of due process that those responsible for decisions which affect an individual's property and/or liberty interests must be impartial.  It is further indubitably established that decisionmakers who have such a personal pecuniary interest in the outcome of proceedings affecting an individual's property or liberty interests as would likely cause them "not to hold the balance nice, clear and true between the accused and the State" do not qualify as impartial decisionmakers.  Tumey v. Ohio, 273 U.S. 510, 532, 522, 47 S. Ct. 437, 444, 441, 71 L. Ed. 749 (1927). ...  See also Withrow v. Larkin, 421 U.S. 35, 46, 95 S. Ct. 1456, 1464, 43 L. Ed. 2d 712 (1975) (due process requirement of fair trial in fair tribunal applies to administrative agencies as well as to courts).

986 F. Supp. 1028, 1032 (S.D. Miss. 1997), aff'd, 163 F.3d 1355 (5th Cir. 1998).  Accordingly, the Supreme Court held in Gibson v. Berryhill that federal courts should not abstain under Younger where an administrative body is found incompetent by reason of bias to adjudicate the issues pending before it.  411 U.S. 564, 577, 93 S. Ct. 1689, 36 L. Ed. 2d 488 (1973).  See Withrow, 421 U.S. at 44 n.8, 95 S. Ct. 1456 (observing that fundamental

assumption underlying the <u>Younger</u> abstention doctrine is the presence of a competent state forum); <u>see also</u> <u>Yamaha Motor Corp.</u>, 21 F.3d at 798 (holding that "[a]djudication by an incompetent state tribunal precludes a federal court from abstaining on <u>Younger</u> grounds."); <u>Trust & Inv. Advisers, Inc. v. Hogsett</u>, 43 F.3d 290, 295 (7th Cir. 1994) (recognizing that "[w]hen the state tribunal is deemed to be biased or to have otherwise prejudged the controversy, abstention in deference to the state proceeding under <u>Younger</u> is inappropriate."). Where such bias is shown, the court may not abstain, even if the federal plaintiff has access to review by an unbiased state tribunal. <u>See</u> <u>Ward v. Vill. of Monroeville, Ohio</u>, 409 U.S. 57, 61-62, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972) ("Nor ... may the State's ... procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral detached judge in the first instance"); <u>United Church of the Medical Ctr. v. Medical Ctr. Comm'n</u>, 689 F.2d 693, 701 (7th Cir. 1982) (explaining that "[s]ubmission to a fatally biased decisionmaking process is in itself a constitutional injury" which is not cured by "judicial review of [the] biased state administrative proceedings, even if on a *de novo* basis").

"Bias can be shown by a finding that the adjudicator prejudged the issues or had a pecuniary interest in the subject of

33

the action." <u>Yamaha Motor Corp.</u>, 21 F.3d at 798 (citing <u>Gibson</u>, 411 U.S. at 578, 93 S. Ct. 1689).  <u>See</u> <u>Tumey</u>, 273 U.S. at 532, 47 S. Ct. 437 ("[I]t certainly violates the Fourteenth Amendment and deprives a defendant ... of due process of law to subject his liberty or property to the judgment of a court which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case."); <u>Gibson</u>, 411 U.S. at 578-79, 93 S. Ct. 1689 (holding that "those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes."); <u>Baran v. Port of Beaumont Navigation Dist. of Jefferson Cnty.</u>, 57 F.3d 436, 444 (5th Cir. 1995) (recognizing that decisionmaker's actual bias or probability of actual bias stemming from pecuniary interest violates due process guarantee).

"When an adjudicator has a direct, personal, and substantial pecuniary interest in the outcome of a case, due process is abrogated." <u>New York State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n</u>, 198 F.3d 1, 13 (1st Cir. 1999) (citing <u>Tumey</u>, 273 U.S. at 523, 47 S. Ct. 437).  Such an interest is sufficiently substantial to amount to a due process violation if it "would offer a possible temptation to the average ... judge to ... lead him not to hold the balance nice, clear and true...."  <u>Ward</u>, 409 U.S. at 60, 93 S. Ct. 80 (1986).  However, "a pecuniary interest need not be personal to compromise an adjudicator's neutrality." <u>Esso Standard Oil Co. (P.R.) v. Mujica Cotto</u>, 389 F.3d 212, 219

(1st Cir. 2004) (<u>Esso I</u>); <u>see</u> <u>also</u> <u>Trust & Inv. Advisers, Inc.</u>,
43 F.3d at 295 (due process proscription of biased adjudicators is
"sufficiently broad to encompass not only those adjudicators with
significant, personal financial stakes in the outcome of their
cases, but also those whose interests are indirect or somewhat
less than substantial."). Even in the absence of a personal
financial interest, when structural infirmities create inherent
bias on the part of the adjudicator, due process is compromised.
Thus, federal intervention and protection is required "even if the
pecuniary interest is only an indirect outgrowth of a public
official's desire to protect official funds." <u>Meyer v. Niles</u>
<u>Township</u>, 477 F. Supp. 357, 362 (N.D. Ill. 1979). <u>See</u> <u>also</u> <u>United</u>
<u>Church</u>, 689 F.2d at 699 (under <u>Gibson</u>, proceedings which give
state agency a financial stake in the outcome of proceedings
violate due process).

The court's inquiry into All American's claim of
institutional bias must "involve a realistic appraisal of the
effect that the alleged pecuniary interest would likely have on
the adjudicator's capacity for fair and impartial decisionmaking."
<u>Trust & Inv. Advisers, Inc.</u>, 43 F.3d at 297. To sustain its
burden to demonstrate that Commissioner Corley has a disqualifying
bias, All American must show that penalties collected as a result
of the Department's enforcement activities constitute a material
source of funding for the Department that could affect

Commissioner Corley's ability to impartially preside over All
American's case, and that the Department actually has control over
how these funds are spent.  See Id. at 297 (observing that if the
Division's power over how funds generated from penalties are spent
is limited, or the portion of its budget that these funds comprise
is insubstantial, a finding of institutional bias would not be
warranted).  A review of pertinent authorities confirms the
importance of both requirements.  See Ward, 409 U.S. at 59-60, 93
S. Ct. 80 (holding that village mayor was not disinterested and
impartial judicial officer in petitioner's trial on traffic
offenses where mayor was responsible for village finances, and
mayor's court, through fines, forfeitures, costs and fees,
provided a substantial portion of the village funds); Esso II,
(finding that where state board that would adjudicate claim had
"complete discretion" over the use of funds supplied by the fines
it imposed and the $76 million proposed fine was "so unprecedented
and extraordinarily large," "the possibility of temptation is
undeniable and evident"); United Church, 689 F.2d at 699 (finding
that state commission had pecuniary interest in the outcome of
reverter proceedings sufficient under Gibson to mandate its
disqualification because "if the commission finds a nonuse or
disuse, the property reverts to the commission without cost to the
Commission even though the property has valuable improvements on
it, and in the event of a subsequent sale of the property, the

proceeds redound to the coffers of the Commission"); <u>Mallinckrodt</u> <u>LLC v. Littell</u>, 616 F. Supp. 2d 128, 144(D. Me. 2009) (where proposed remedy, if implemented, would have generated $14.4 million, enough to totally fund the defendant Board for more than 30 years, court found no disqualifying bias, for while "the Board conceivably could have an interest in selecting a remedy with substantial financial upside for the state, ... any institutional interest [was] minimized by a statutory scheme strictly limiting the Board's receipt and control over funds possibly derived from the Order" since the Board was limited to receiving no more than $325,000 per year from the fund into which the monies were paid and by statute, funds received by the Board "could only be expended in accordance with allocations approved by the state legislature").

The Department of Banking and Consumer Finance is a special funds agency that is wholly self funded.  The Department receives revenue from two divisions:  the Banking Division and the Consumer Finance Division.  The Consumer Finance Division covers nine areas of the financial services industry, including check cashers and title pledge lenders.[15]  Revenue from these businesses comes from

---

[15]    It also covers the following financial service businesses: Consumer Loan Brokers; Debt Management Service Providers; Insurance Premium Financiers; Motor Vehicle Sales Financiers; Money Transmitters; Pawnbrokers; and Small Loan lenders.

licensing fees, license renewal fees, examination fees and civil penalties.  By statute, all fees and penalties collected by the Department relating to all of the financial service industries it regulates are deposited in a single account at the Office of the State Treasury denominated the Consumer Finance Fund.  The funds in that account are used for operation of the Department.

Historically, penalties have comprised a negligible percentage of the Department's revenue.  For example, for fiscal year 2014, the Department's total revenue for the Consumer Finance Division was $3,231,215.41, of which only $39,7628.74 was from penalties.  The Department's total approved budget for 2014 was $7,713,849.  For fiscal year 2015, the total revenue from the Consumer Finance Division was $3,481,202, of which only $53,600 was from penalties.  The recommended civil penalty of $3 million in this single administrative action is, as All American notes, "unprecedented"; if imposed and collected, it would probably account for nearly half of the Consumer Finance Division's annual revenue and amount to nearly forty percent of the Department's annual budget.  Clearly, then, the proposed penalty would be a material funding source for the Department.  The real issue is whether the Department has control over the disposition of the penalty monies deposited in the Consumer Finance Fund.

On this issue, All American has argued that by statute, "Ms. Corley is entrusted with <u>sole</u> authority and significant discretion

to expend funds that are deposited into the Consumer Finance
Fund."  Two statutes which it cites for this proposition provide
that penalty monies, when collected, are to be deposited in the
Consumer Finance Fund "and shall be expended by the commissioner
solely and exclusively for the purpose of administering and
enforcing the provisions of this article[/chapter]."  <u>See</u> Miss.
Code Ann. § 81-19-19, § 81-21-3.[16]  If these statutes applied to
All American, there might be merit to All American's position.
<u>Cf.</u> <u>MCS Health Mgmt. Options, Inc. v. Mellado Lopez</u>, Civ. No. 14-
1223(PG), 2015 WL 1212215, at *12 (D.P.R. Mar. 17, 2015)
(observing in <u>dictum</u> that state statute providing that all monies
collected as a result of administrative fines were to be deposited
in a special fund in the Treasury Department "for the exclusive
benefit of [OPA] to cover part of their operating expenses and to

---

[16]    Miss. Code Ann. § 81-19-19 states:
"All funds coming into the possession of the
commissioner as a result of this chapter, including all
annual fees and examination fees, shall be deposited by
the commissioner into the special fund in the State
Treasury known as the 'Consumer Finance Fund,' and shall
be expended by the commissioner solely and exclusively
for the administration and enforcement of this chapter."
Miss. Code Ann. § 81-21-3 states:
All fees, license tax and penalties provided for in this
chapter that are payable to the commissioner shall, when
collected by him or his designated representative, be
deposited in the special fund in the State Treasury
known as the "Consumer Finance Fund" and shall be
expended by the commissioner solely and exclusively for
the purpose of administering and enforcing the
provisions of this chapter.

provide direct service to the population it serves" "would have
been sufficient under the [Gibson] rule to mandate
disqualification" of the administrative adjudicator; but that
statute had been repealed and there was otherwise insufficient
evidence of pecuniary bias).  However, these statutes are not part
of the Check Cashers Act or the Title Pledge Act but are instead
part of the Consumer Loan Broker Act and the chapter regulating
premium finance companies, respectively.  There is no similar
provision in the Check Cashers or Title Pledge Acts.  Rather, the
corresponding provisions in those Acts state only that fees and
penalties collected are to be "paid into the Consumer Finance Fund
of the Department of Banking and Consumer Finance."  See Miss.
Code. Ann. § 75-67-505 (Check Cashers Act); Miss. Code Ann. § 75-
67-419 (Title Pledge Act); see also Miss Code Ann. § 75-67-527(4)
(Check Cashers Act) ("The commissioner may impose a civil penalty
against any licensee adjudged by the commissioner to be in
violation of the provisions of this article.  The civil penalty
shall not exceed Five Hundred Dollars ($500.00) per violation and
shall be deposited into the Department of Banking and Consumer
Finance, 'Consumer Finance Fund.'").  They do not include the
additional verbiage that penalties collected "shall be expended by
the commissioner solely and exclusively for the administration and
enforcement of this chapter."  Thus, while the statutes cited by
All American may vest the commissioner with control over monies

from civil penalties imposed under the Consumer Loan Broker Act and the chapter regulating premium finance companies, there is no state statute which requires that penalties collected by the commissioner under the Check Cashers Act or Title Pledge Act be used "solely and exclusively by the commissioner" or for any particular purpose.

As for all other monies in the Consumer Finance Fund, it is apparent that the Department lacks the discretion to simply assess, collect and spend any moneys recovered.  All money the Department collects is subject to legislative oversight, appropriation and control.  As the Department points out in its most recent brief, under Mississippi law, like all other state agencies, the Department's annual revenues constitute state funds, its revenues are entirely subject to legislative control, and its expenditures are entirely subject to legislative appropriation. See Miss. Const., art. 4, § 63 ("No appropriation bill shall be passed by the Legislature which does not fix definitively the maximum sum thereby authorized to be drawn from the Treasury."). The Department is required to submit financial reports to the Legislature, as well as an annual proposed budget in advance of each fiscal year.  See Miss. Code Ann. § 27-103-127 (agency budgets); § 27-103-135 (Legislative Budget Office and Department of Finance and Administration revenue reports); § 27-103-159 (Joint Legislative Budget Committee reports).  The Legislature

41

either approves, disapproves or modifies the Department's proposed budget for the next fiscal year and appropriates the Department's funds.  See Miss. Code Ann. § 27-103-127 (legislative budget approval "shall be set forth in an appropriation act").  Once approved, the budget constitutes the maximum amount of funds that may be utilized in the forthcoming fiscal year. Miss. Code Ann. § 27-103-127 ("the expenditures approved or authorized by the Legislature for any special fund agency or special funds approved for general fund agency shall constitute the maximum to be expended or encumbered by such agency" and "[n]o special fund agency or general fund agency shall make expenditures from special funds available to such agency unless such expenditures are set forth in a budget approved by the Legislature").  If funds are collected beyond those set forth in the approved budget, they may not be immediately spent by the Department but instead are included as part of the Department's revenue and reflected in the Department's budget request for the succeeding year.  Disposition of the money in the succeeding or future fiscal years is determined by the Legislature through its annual legislative budget approval and appropriations process.  In short, the Legislature ultimately decides how much the agency can spend, and what expenditure items are authorized.

All American does not dispute any of this, but it submits that so long as the Department can meet its proposed expenses

42

through existing and anticipated revenue, the Legislature's approval of the Department's budget request is "routine for the most part."[17]  For its part, the Department maintains that Legislative approval is hardly "routine," as there are multiple layers of governmental review and oversight standing between an agency's expenditure authorization requests and the Legislature's ultimate disposition of them.  Thus, even if approval is usually forthcoming, the fact remains, it is the Legislature, not the Department, that decides whether and how the funds may be expended.[18]

The Department further points out that it is fully within the Legislature's power to appropriate money from special fund agencies like the Department to other agencies or to the State's general fund.  All American acknowledges this; but it contends that Ms. Corley can "manipulate sources of revenue" to avoid the appearance of excess funds and thereby avoid the loss of excess funds.  It contends, for example, that "[i]f she were so inclined, Ms. Corley could impose the unprecedented civil fines against All

-----

[17]   In support of its position, All American has submitted an affidavit from John Allison, Ms. Corley's predecessor.

[18]   Even All American does not contend that approval is routine without exception.  It asserts only that approval is routine "for the most part."  One might reasonably anticipate that an agency's submission of a budget request that seeks an extraordinary forty percent increase in expenditures would garner increased scrutiny and decrease the likelihood that it would be "rubber stamped."

American, and use that revenue to offset or reduce bank assessments." In other words, she could choose to forego bank assessments and thereby shift a large portion of the burden of funding the Department from the Banking Division to the Consumer Finance Division. Yet All American suggests no reason why Ms. Corley might be "so inclined" or "tempted" to impose penalties against All American for no reason other than to replace or substitute revenue the Department is already receiving from another source.[19] All American, in the court's view, has not substantiated its claim that imposition (and collection) of the proposed penalty would result in a "windfall" to the Department or would enrich the Department's coffers in any material way.

In short, therefore, having considered all the parties' arguments and proof, the court finds that All American has failed to show that Commissioner Corley labors under any impermissible pecuniary bias that would prevent her from functioning as an impartial decisionmaker.

Conclusion

Therefore, based on all of the foregoing, the court concludes that the requirements for Younger abstention are met and that no exception applies. It follows that this court must abstain from

---

[19] All American notes that Ms. Corley has a background in banking. It is a far leap to conclude from nothing more than this that she would be tempted to impose a huge fine on All American so she can reduce bank assessments.

and dismiss All American's claim for injunctive relief and deny
its motion seeking the same relief.  See Milone v. Flowers, 758 F.
Supp. 2d 362, 364 (S.D. Miss. 2010) (if requirements for Younger
abstention are satisfied, "the district court must dismiss the
federal action and allow the state process to continue").
However, "requests for monetary damages do not fall within the
purview of the Younger abstention doctrine," Allen v. La. State
Bd. of Dentistry, 835 F.2d 100, 104 (5th Cir. 1988), and
therefore, All American's claims for monetary relief are not
subject to dismissal under Younger.  See Deakins v. Monaghan, 484
U.S. 193, 202, 108 S. Ct. 523, 529, 98 L. Ed. 2d 529 (1988) (even
if Younger doctrine requires abstention as to claims for equitable
relief, "the District Court has no discretion to dismiss rather
than to stay claims for monetary relief that cannot be redressed
in the state proceeding").  At this time, there is pending a
separate motion by defendants to dismiss All American's remaining
claims against the Department on Eleventh Amendment grounds, and
to stay the individual capacity claims against Department
officials pending a resolution of the state proceedings.  The
court will await a response by All American to that pending motion
prior to addressing the proper disposition of these remaining
claims.[20]

---

[20]     By text order entered March 3, 2016, All American has
been granted an extension of time to respond to defendants'
motion.  The response is due 20 days from entry of this opinion.

45

Accordingly, it is ordered that All American's claim for injunctive relief and its motion seeking the same relief is dismissed.

SO ORDERED this 22nd day of March, 2016.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE